# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 21-1265V

|  |  |
|---|---|
| JENNIFER SILACCI,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: December 5, 2024 |

*Rhonda Lorenz-Pignato*, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND RULING ON ENTITLEMENT**[1]

On April 21, 2021, Jennifer Silacci filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine she received on February 13, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that Petitioner more likely than not suffered the residual effects of her alleged vaccine-related injury for more than six months, and

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

that she has satisfied all of the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I.  Relevant Procedural History

On March 31, 2023 (about 23 months after the case was initiated), Respondent filed his Rule 4(c) Report, arguing therein that Petitioner could not satisfy the severity requirement or the Table elements of a SIRVA claim. ECF No. 36. Petitioner subsequently filed a Brief on Severity and Motion for a Ruling on the Record ("Mot.") on October 20, 2023. ECF No. 44. Respondent filed a response ("Resp.") on December 29, 2023 and Petitioner filed a reply ("Repl.") on January 23, 2024. ECF No. 45-46. The matter is now ripe for adjudication.

## II.  Relevant Facts

### a. *Medical Records*

Petitioner received a flu vaccine in her right deltoid on February 13, 2020, at her primary care provider's ("PCP") office in Boulder, CO. Ex. 5 at 83. Petitioner's pre-vaccination medical records reveal a motor vehicle accident in 2017, after which she suffered right trapezius and scapular symptoms, and two ankle fractures in 2018 and 2019. Ex. 5 at 56, 73; Ex. 7 at 75-76; Ex. 9 at 5.

On February 22, 2020 (nine days after vaccination), Petitioner emailed her doctor reporting that her arm was "still very tender, achy, and weak" from her flu shot. Ex. 2 at 2. She reported that the shot was given high on her arm "toward the top of [her] shoulder" and that she had trouble lifting her arm above her head. *Id*. Her doctor advised that she use Tylenol or ibuprofen and make an appointment if her pain continued. *Id*.

Petitioner had surgery to remove hardware from her ankle on February 28, 2020. Ex. 6 at 20. She had a telehealth follow-up on March 17, 2020. *Id*. at 39. Neither record includes any reference to shoulder pain.

Petitioner emailed her PCP again on April 21, 2020 (two months after her vaccination) reporting continued pain in her right shoulder "where the vaccine was administered." Ex. 2 at 3. She stated that "if we were not in the middle of a pandemic, [she'd] have come in, or consulted with [her] orthopedic surgeon." *Id*. Petitioner was advised to consult with a new physical medicine and rehabilitation doctor. *Id*.

There is a subsequent treatment gap of approximately four months. On August 18, 2020, Petitioner had a yearly skin examination with her dermatologist. Ex. 9 at 38-45. The record does not include any references to shoulder pain.

Less than three months later, on November 6, 2020, Petitioner saw her PCP for a telehealth appointment for complaints of abdominal cramping. Ex. 5 at 86. This record does not contain any references to shoulder pain.

On February 23, 2021 (one year after vaccination), Petitioner returned to her PCP for an annual exam. Ex. 2 at 92. She now reported right shoulder pain "since [her] flu shot 1 yr ago." *Id*. Petitioner also reported that she had recently had a Covid-19 infection. *Id*. at 93. She was referred to a physical medicine and rehabilitation specialist. *Id*. at 92.

Petitioner saw an orthopedist the following month (on March 5, 2021), where she reported right shoulder pain that "began just over a year ago after she received her flu shot." Ex. 6 at 36. On exam, she had normal range of motion ("ROM") and strength. *Id*. Impingement and biceps testing was positive. *Id*. She was diagnosed with tendinitis, prescribe diclofenac, and referred to physical therapy. *Id*. at 36-37.

Petitioner began a course of physical therapy on March 9, 2021. Ex. Ex. 7, Vol. II at 8. She reported getting a flu shot in February 2020 and having "pain in [the] shoulder ever since." *Id*. On exam, she had reduced ROM and tenderness to palpation in the lateral shoulder. *Id*. 8-9. Treatment was planned for 1-2 times per week for eight weeks. *Id*. at 9. She attended a total of seven physical therapy treatments through May 11, 2021. Ex. 7, Vol. II at 8-16.

Petitioner returned to her orthopedist on April 19, 2021. Ex. 6 at 98. She reported "good improvement" with physical therapy. *Id*. He recommended that she transition to a home exercise program and return if needed. *Id*. at 99.

No further medical records relating to Petitioner's shoulder pain have been filed.

### b. Relevant Other Evidence

Petitioner filed several affidavits from witnesses along with other evidence in support of her claim. In her affidavit, she recalled feeling "an immediate pinch, discomfort, and burning" during her flu shot, which worsened that evening." Ex. 1 at ¶7, 10. She remembered her arm feeling weak and being unable to lift her arm above her head within 48 hours of the vaccination. *Id*. at ¶11.

Petitioner has also stated that, beginning in March 2020, her fear of the Covid-19 virus prevented her from seeking care for her right shoulder pain. *Id*. at ¶17. She explained that "as a therapist working with essential workers," she heard many stories of people suffering and dying from Covid-19, which made her "extremely cautious" about exposure to the virus. Ex. 16 at ¶4-5.

She recalled contacting her PCP in April 2020 about a video appointment and being referred to a new and unknown provider. *Id*. at ¶19. Petitioner also stated that, in

late April 2020, she called the orthopedist who had treated her lower extremities and was told that he did not treat shoulder problems and to "give it time." *Id.* at ¶19.

Petitioner also claims to have discussed her shoulder pain with her friend, Cherie Marchionna. The two travelled together between February 20-24, 2020, during which Ms. Marchionna recalled Petitioner talking daily about her shoulder pain and doing ROM exercises. Ex. 13 at ¶8. Petitioner also recalled a text exchange she had with Ms. Marchionna on April 25, 2020 in which she reported her continuing shoulder pain. *Id*. at ¶20. She provided the text messages, which were authenticated by Ms. Marchionna in her affidavit. *See* Ex. 3 at 1-4; Ex. 13 at ¶11. Petitioner said that she had had "pain post-flu shot" for "over 10 weeks" and asked for a recommendation to a shoulder specialist. Ex. 3 at 1. She stated that she had limited ROM and couldn't sleep due to the pain. *Id*. She reported that she had called her previous orthopedist and "was totally dismissed." *Id*. at 2. Petitioner texted with Ms. Marchionna again on May 7, 2020 – where she noted that her shoulder was "a bit better," but still irritated if she did pushups. *Id*. at 5.

Petitioner addressed her in-person visit with her dermatologist on August 18, 2020, stating that she decided to keep the appointment based on an analysis of risks and benefits. Ex. 16 at ¶15-20. She explained that she is high-risk for melanoma due to a family history of skin cancer in both parents and other relatives and regularly saw a dermatologist prior to the pandemic. *Id.* By August 2020 it had been a year since her last skin exam. *Id*. at ¶17, 19. Further, the dermatology practice (which was small and in an independent location) implemented significant precautions, such as preventing contact between patients and the doctor wearing full personal protective equipment during the brief exam. *Id*. at 16. She explained that she did not have the same level of confidence with the precautions taken by her PCP's office (which was part of a large medical facility). *Id*. at 21.

Petitioner further addressed her November 6, 2020 telehealth visit with her PCP. Ex. 16 at ¶22. She explained that she was suffering from abdominal cramping, which concerned her due to a history of gastroparesis. *Id*. She recalled technical difficulties during the call that hindered her ability to receive care. *Id*. She also stated that her experience with her PCP was that she was "only permitted to talk about the specific concern [she] made the appointment for." *Id*.

Petitioner's mother, Ann Silacci, provided an affidavit in which she recalled a text communication with Petitioner on September 11, 2020. Ex. 20 at ¶9. Petitioner provided a copy of the text message, which was authenticated by her mother. Ex. 3 at 6; Ex. 20 at ¶9. The text message includes a photo of boy with a bandage on his arm, who Ms. Ann Silacci stated was her grandson who had gotten a flu shot. *Id*. Petitioner replied that "[her] shoulder [was] still messed up from [hers] in February." Ex. 3 at 6. Ms. Ann Silacci also recalled a phone call she had with Petitioner in March 2021 in which Petitioner told her

that she continued to have shoulder pain more than a year after her vaccination. Ex. 20 at ¶10.

Petitioner stated that she contracted Covid-19 in February 2021, after which she felt more comfortable seeking in-person care for her shoulder pain due to the lowered risk of re-infection. Ex. 16 at ¶13.

### III.     Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

In addition to requirements concerning severity of petitioner's injury, a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder

resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (*e.g.* tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV. Findings of Fact

### A. *Severity*

To satisfy the statutory severity requirement, Petitioner must demonstrate that her symptoms more likely than not continued until at least August 13, 2020 – six months after her February 13, 2020 vaccination.

Respondent initially argues that Petitioner has not satisfied the statutory severity requirement because Petitioner had a "substantial gap in treatment," with "multiple intervening medical appointments during that gap where she did not mention or complain of shoulder pain." Resp. at 9. And the record corroborates the gap. Petitioner communicated with her PCP about her post-vaccination shoulder pain on February 22, 2020 and April 21, 2020 – but then did not again seek treatment until February 23, 2021. Ex. 2 at 2-3; Ex. 5 at 92-98.

But Petitioner has provided a reasonable explanation for her decision to delay medical treatment for her shoulder, and evidence of ongoing symptoms during the period – both of which are enough evidence to find the severity requirement has been preponderantly established. Petitioner's vaccination occurred on February 13, 2020, approximately one month before the beginning of lockdowns throughout the country due to the Covid-19 Pandemic. Petitioner has explained in detail the reasons why she was extremely cautious during the Pandemic, and the preventative steps she took to protect herself from it – including not leaving her home, masking, and social distancing, even outside. *See* Ex. 16 at ¶3-5.

When Petitioner reached out to her PCP in April 2020 to ask about possible treatment, she understood that a virtual appointment was not recommended and did not feel comfortable seeking in-person care from an unknown provider. Ex. 16 at ¶13. As a result, she waited until after she contracted (and recovered from) the virus in February 2021 to seek in-person treatment for her shoulder pain because she believed the immunity from infection would provide protection from reinfection. *Id*. at ¶28; *See also* Ex. 2 at 93 (Petitioner reported her recent Covid-19 infection to her provider when she sought care for her shoulder). Further, there is no evidence *other* than the subsequent treatment gap that Petitioner's symptoms resolved.

In addition, Petitioner has provided witness statements and text messages that evidence the fact of her shoulder pain during the six-months after her vaccination. On April 25, 2020, for example, Petitioner reached out to her friend for a recommendation for a shoulder specialist, telling her that she had suffered "over 10 weeks" of shoulder pain "post-flu shot" with limited ROM and difficulty sleeping. Ex. 3 at 1. She mentioned that she had called her previous orthopedist but felt dismissed. *Id*. at 2. Petitioner's friend followed up a few weeks later, on May 5, 2020, to ask about Petitioner's shoulder. *Id*. at 5. Petitioner indicated improvement, but stated that her shoulder was "still irritated if [she] tried pushups, etc." *Id.* Petitioner also provided evidence of text message exchanges with her mother on September 11, 2020, in which she noted that her shoulder was "still messed up" from her flu shot in February. *Id*. at 6. Such evidence reveals that even if Petitioner did not seek treatment from a medical provider during this time, she was telling her friends and family about her ongoing symptoms, and that she continued to have shoulder symptoms as of September 11, 2020 (and that date alone is enough to find six months of severity, when measured from the February vaccination date).

There is evidence that Petitioner sought treatment not only during the gap, but in the midst of the Pandemic as well. Resp. at 9-10. But I do not find that this evidence undermines a favorable severity finding.

For example, on August 18, 2020, Petitioner had an in-person visit with her dermatologist for a skin check. Ex. 9 at 38. But as Petitioner has explained, she was

compelled to seek this treatment despite her Pandemic concerns due to a significant family history of skin cancer. Ex. 16 at ¶15-20. And this would not have been an occasion to mention shoulder pain in any event. There is also the November 6, 2020 telehealth visit with Petitioner's PCP to address abdominal cramping she had experienced for ten days. Ex. 5 at 86. But again, Petitioner has explained why this medical issue was significant enough to her to seek treatment (and it too would not have been an event in which she might reasonably have been expected to share all of her existing medical concerns, like the ongoing shoulder pain). Ex. 16 at ¶22. Thus, while Respondent is correct that such evidence suggests Petitioner could also have sought treatment for her shoulder pain, I do not find on this record that the omission of mention of the symptoms mandates the finding that they did not exist. (The gap does, however, *greatly undermine* grounds for a significant award of pain and suffering in this case – and Petitioner should be mindful of this going forward).

Thus, after consideration of the entire record, I find that Petitioner has provided a preponderance of evidence that she suffered from her vaccine-related injury for a period of more than six months.

### B. *History of Right Shoulder Pain Prior to Vaccination*

Next, Respondent argues that Petitioner cannot provide preponderant evidence that she does not have a history of pre-vaccination right shoulder pain as required by the first QAI for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(i); Resp. at 13. Respondent's argument is based on medical records that indicate that Petitioner suffered from "neck tightness and pain, trapezius spasms, and tightness in the right upper trapezius muscle and levator scapula" after a car accident in 2017. *Id*. However, the symptoms highlighted by Respondent occurred outside of the shoulder – in the neck and back.

Further, the QAIs for a Table SIRVA require that a petitioner provide evidence that she had no pain, inflammation, or dysfunction of the affected shoulder *that would explain* the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection. 42 C.F.R. §100.3(c)(10)(iv)(emphasis added). Respondent has provided no argument that Petitioner's neck and back pain after a car accident would explain her complaints of pain, weakness, and reduced range of motion in her right shoulder after vaccination. Therefore, I find in Petitioner's favor on this issue.

### C. *Limited Range of Motion*

Respondent finally argues that Petitioner has failed to demonstrate limited range of motion as required by the third QAI for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(iii); *See also Bolick v. Sec'y of Health & Human Servs.*, No. 20-0893, 2023 WL 8187307, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (establishing that the third QAI requirement

"requires that a Petitioner demonstrate they suffered both pain and limited range of motion."). Respondent alleges that "there is no objective evidence that Petitioner had reduced range of motion" until she started physical therapy on March 9, 2021, more than a year after her vaccination. Resp. at 13. Respondent further argues that "because Petitioner's orthopedist consistently found that Petitioner had normal range of motion and objective testing during physical therapy did not have a comparison to the left shoulder, Petitioner has not shown by preponderant evidence that her right shoulder range of motion was reduced." *Id*.

Respondent's argument suggests that a petitioner must prove reduced range of motion at some specified time after vaccination and must prove that the motion was reduced further than that of the non-vaccinated shoulder. The QAI, however, contain no such requirements. There is objective evidence in the record that Petitioner's right shoulder range of motion was reduced from normal. *See* Ex. 7-Vol. II at 8. Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY, 72, 80, 84, 88 (F.A. Davis Co., 5th ed. 2016). During her initial physical therapy evaluation, Petitioner had right shoulder flexion to 140 degrees, abduction to 120 degrees, and external rotation to 65 degrees - meaning there is objective evidence in the record that her range of motion was reduced from normal. Ex. 7-Vol.II at 8.

Respondent cites to *Brennom v. Sec'y of Health & Human Servs.*, No. 21-0051V, 2023 WL 7490248 at *5 (Fed. Cl. Spec. Mstr. Oct. 6, 2023) to support his argument that the range of motion testing at Petitioner's physical therapy appointment was "too long after the six-month severity timeframe to conclude it was more likely than not related to the SIRVA, as opposed to some other intervening event." Resp. at 13, fn. 10. However, the issue in that case was whether the petitioner had met the severity requirement – and the testing in question showed findings (other than SIRVA) that could account for her renewed symptoms. *Brennom,* 2023 WL 7490248 at *5. There is no similar evidence, nor any evidence of another intervening event, here. And I do not otherwise find that ROM limits must arise in a particular timeframe, measured from vaccination.

Finally, petitioners are not required to show that their range of motion is reduced compared to the non-vaccinated shoulder. To read such a requirement into the QAI would mean that any petitioner with a pre-existing injury to the opposite shoulder would be precluded from making a claim for a SIRVA injury. Normal range of motion, or lack thereof, in the affected shoulder is an objective assessment – and here, Petitioner has provided evidence in a medical record that her right shoulder range of motion was reduced. *See* Ex. 7, Vol. II at 8. Therefore, I find that Petitioner has provided preponderant evidence to satisfy the third QAI Table requirement for a SIRVA injury.

## V.	Ruling on Entitlement

### A.	*Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that she experienced limited range of motion as required and that she had no history of pain prior to vaccination that would explain her post-vaccination symptoms. 42 C.F.R. § 100.3(c)(10)(i-iii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10). Accordingly, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury.

### B.	*Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccination on February 13, 2020 in Boulder, CO. Ex. 5 at 83; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. Ex. 1 at ¶36-37; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

   **IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master
